IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

| | | |
|---|---|---|
| CAPE FEAR PUBLIC UTILITY AUTHORITY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 7:17-cv-00195-D |
| THE CHEMOURS COMPANY FC, LLC, et al. | ) ) ) | |
| Defendants. | ) ) | |
| ———————————————— | ) ) | |
| BRUNSWICK COUNTY, a governmental entity, | ) ) ) | |
| Plaintiffs, | ) ) | No. 7:17-cv-00209-D |
| v. | ) ) | |
| DOW DUPONT, INC., et al., | ) ) | |
| Defendants. | ) ) | |
| ———————————————— | ) | |

**DEFENDANTS' MOTION TO DISMISS PLAINTIFFS'
MASTER COMPLAINT UNDER RULE 12(B)(6) OR,
IN THE ALTERNATIVE, FOR A STAY OF PROCEEDINGS, AND
<u>MOTION TO STRIKE OR DISMISS NOTICES TO CONFORM</u>**

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 3

I.      PLAINTIFFS' CLAIMS ............................................................................................ 4

II.     FEDERAL AND STATE AUTHORITY OVER SAFE-DRINKING-WATER
        STANDARDS............................................................................................................. 5

III.    REGULATORY ACTIVITY CONCERNING C3 DIMER ACID AND OTHER
        CHEMICALS ............................................................................................................. 7

        A.      Review by the Science Advisory Board .................................................... 8

        B.      DEQ and DHHS's Involvement in Investigating and Addressing C3
                Dimer Acid........................................................................................................ 9

ARGUMENT ....................................................................................................................... 14

I.      PLAINTIFFS HAVE FAILED TO STATE ANY LEGALLY COGNIZABLE
        CLAIM....................................................................................................................... 15

        A.      Plaintiffs Fail to Plead the Elements of Nuisance (Counts I and II) ...................... 15

        B.      Plaintiffs Fail to Plead the Elements of Trespass to Real Property
                (Count III) .......................................................................................................... 16

        C.      Plaintiffs Fail to Plead the Elements of Trespass to Chattels (Count IV)..............17

        D.      Plaintiffs Fail to Plead the Elements of Negligence (Counts V, VI and
                VIII) ....................................................................................................................18

        E.      Plaintiffs Fail to Plead an Actionable Failure to Warn Theory (Count
                VII)......................................................................................................................20

        F.      Plaintiffs Cannot Bring an Independent Cause of Action for Injury to
                Riparian Rights (Count IX)...............................................................................20

        G.      Plaintiffs Cannot Bring an Independent Cause of Action for Punitive
                Damages (Count X) ..........................................................................................21

II.     ALTERNATIVELY, THE PRIMARY-JURISDICTION DOCTRINE
        WARRANTS A STAY OF THESE PROCEEDINGS.................................................. 21

A.   Plaintiffs' Claims Turn on Questions and Considerations Within
     DEQ's Expertise ....................................................................................22

B.   Issues Concerning How to Investigate, Monitor, and Address Surface-
     Water Quality Fall Within DEQ's Unique Discretion...........................................23

C.   The Relief Sought by Plaintiffs Creates a Substantial Risk of
     Inconsistent Conclusions and Requirements ...........................................................24

D.   The Issues Raised by Plaintiffs' Complaint Are Already Before DEQ.................24

MOTION TO STRIKE OR DISMISS NOTICES TO CONFORM ..............................................26

I.   BACKGROUND ............................................................................................................27

II.  ARGUMENT...................................................................................................................27

CONCLUSION.............................................................................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*Am. Auto. Mfrs. Ass'n v. Mass. Dep't of Envtl. Prot.*,
163 F.3d 74 (1st Cir. 1998) ............................................................................................22

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .........................................................................................................15

*Barrier v. Troutman*,
231 N.C. 47, 55 S.E.2d 923 (1949) ..................................................................................15

*Brooks v. E.I. du Pont de Nemours & Co.*,
944 F. Supp. 448 (E.D.N.C. 1996) .........................................................................15, 16, 19

*Broughton v. McClatchy Newspapers, Inc.*,
161 N.C. App. 20, 588 S.E.2d 20 (2003) ........................................................................16

*BSK Enters., Inc. v. Beroth Oil Co.*,
783 S.E.2d 236 (N.C. Ct. App.),
*disc. rev. denied*, 787 S.E.2d 39, 787 S.E.2d 385 (N.C. 2016) ..............................................21

*CF Indus., Inc. v. Transcon. Gas Pipe Line Corp.*,
614 F.2d 33 (4th Cir. 1980) .....................................................................................3, 24, 25

*Coastal Plains Utils., Inc. v. New Hanover Cty.*,
166 N.C. App. 333, 601 S.E.2d 915 (2004) ....................................................................20

*Coker v. DaimlerChrysler Corp.*,
172 N.C. App. 386, 617 S.E.2d 306 (2005) ....................................................................19

*Far E. Conference v. United States*,
342 U.S. 570 (1952) .........................................................................................................24

*Fordham v. Eason*,
351 N.C. 151, 521 S.E.2d 701 (1999) ..............................................................................17

*Funderburk v. JPMorgan Chase Bank, N.A.*,
241 N.C. App. 415, 775 S.E.2d 1 (2015) ........................................................................21

*Global NAPS N.C., Inc. v. BellSouth Telecomms., Inc.*,
455 F. Supp. 2d 447 (E.D.N.C. 2006) ............................................................................22

*Hall v. Virginia*,
385 F.3d 421 (4th Cir. 2004) .............................................................................................1

*Harris v. Daimler Chrysler Corp.*,
180 N.C. App. 551, 638 S.E.2d 260 (2006) ....................................................................18

*In re Katrina Canal Breaches Consol. Litig.*,
533 F. Supp. 2d 615 (E.D. La. 2008) .................................................................................1

*In re Syngenta AG MIR162 Corn Litig.*,
MDL No. 2591 (D. Kan. June 3, 2015) ......................................................................27, 28

*In re WildeWood Litig.*,
    52 F.3d 499 (4th Cir. 1995) .................................................................................16

*Jordan v. Foust Oil Co.*,
    116 N.C. App. 155, 447 S.E.2d 491 (1994)...........................................................15

*Keyzer v. Amerlink, Ltd.*,
    173 N.C. App. 284, 618 S.E.2d 768 (2005),
    *aff'd per curium*, 360 N.C. 397, 627 S.E.2d 462 (2006) ......................................16

*Matthews v. Forrest*,
    235 N.C. 281, 69 S.E.2d 553 (1952)......................................................................17

*MBR Constr. Servs., Inc. v. Liberty Mut. Ins. Co.*,
    No. GJH-15-14, 2016 WL 3190650 (D. Md. June 6, 2016) ...................................1

*Miss. Power & Light Co. v. United Gas Pipe Line Co.*,
    532 F.2d 412 (5th Cir. 1976) ...........................................................................3, 24

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
    591 F.3d 250 (4th Cir. 2009) .................................................................................15

*New Mexico v. Gen. Elec. Co.*,
    335 F. Supp. 2d 1185 (D.N.M. 2004),
    *aff'd*, 204 F.3d 1122 (11th Cir. 1999)......................................................19, 23, 25

*North Carolina v. Chemours Co. FC*,
    No. 17 CVS 580 (N.C. Super. Ct. Sept. 8, 2017) ...........................................10, 13

*North Carolina v. Dep't of Health, Educ., & Welfare*,
    480 F. Supp. 929 (E.D.N.C. 1979)...................................................................21, 25

*Peace River Elec. Coop., Inc. v. Ward Transformer Co.*, 116 N.C. App. 493,
    449 S.E.2d 202 (1994) ...........................................................................................18

*Piney Run Preserv. Ass'n v. Cty. Comm'rs of Carroll Cty.*,
    268 F.3d 255 (4th Cir. 2001) .................................................................................22

*Rhodes v. E.I. du Pont de Nemours & Co.*,
    636 F.3d 88 (4th Cir. 2011) ..............................................................................18, 19

*Rowe v. E.I. du Pont de Nemours & Co.*,
    262 F.R.D. 451 (D.N.J. 2009) ................................................................................18

*Schiller v. Tower Semiconductor Ltd.*,
    449 F.3d 286 (2d Cir. 2006)...................................................................................22

*Singleton v. Haywood Elec. Membership Corp.*,
    357 N.C. 623, 588 S.E.2d 871 (2003)....................................................................16

*Thomas v. Weddle*,
    167 N.C. App. 283, 605 S.E.2d 244 (2004)...........................................................20

*United States v. Perez*,
    752 F.3d 398 (4th Cir. 2014) .................................................................................29

*Vitol, S.A. v. Primerose Shipping Co.*,
    708 F.3d 527 (4th Cir. 2013) ..................................................................................15

*Yates v. Ford Motor Co.*,
    No. 5:12-CV-752-FL, 2015 WL 2189774 (E.D.N.C. May 11, 2015) ....................20

**Statutes and Rules**

Fed. R. Civ. P 7 .........................................................................................................27

Fed. R. Civ. P. 12 ............................................................................................... *passim*

33 U.S.C. § 1311 ........................................................................................................23

42 U.S.C. § 300f ...........................................................................................................5

42 U.S.C. § 300g-2 ........................................................................................................5

N.C. Gen. Stat. § 99B-5 .............................................................................................20

N.C. Gen. Stat. § 130A-312 ..........................................................................................5

N.C. Gen. Stat. § 130A-315 ......................................................................................5, 6

N.C. Gen. Stat. § 143-211 ...........................................................................................23

N.C. Gen. Stat. § 143-215.1 ........................................................................................23

**Other Authorities**:

5 Charles A. Wright, Federal Practice and Procedure § 1181 ....................................27

Restatement (Second) of Torts § 217 (Am. Law Inst. 2017)......................................18

W. Page Keeton et al., Prosser and Keeton on the Law of Torts: *Elements of Cause of Action*
    § 30 (5th ed. 1984)................................................................................................18

## INTRODUCTION

Beneath a litany of sensationalized assertions, there are two indisputable facts that undermine Plaintiffs' request for relief. First, nowhere in their Master Complaint do Plaintiffs allege that they are required by law to remove or treat the chemicals at issue in this case. Second, despite the allegations in their complaint, Plaintiffs are telling the public and their customers a dramatically different (and far more scientifically accurate) story.

For example, Plaintiffs have advised the public that they "continue to have full confidence that the Brunswick County water supply—including at our schools—is absolutely safe to drink."[1] Plaintiffs are also publicly reporting that testing for C3 Dimer Acid (referred to in Plaintiffs' complaint as "GenX") reveals levels well below the conservative provisional health goal of 140 parts per trillion announced by the North Carolina Department of Health and Human

---

[1]    Leslie K. Tubb & Ann B. Hardy, *Brunswick County & Brunswick County Schools Joint Response to the August 11, 2017 WECT Online Story, "H2GO looks at reverse osmosis systems for schools,"* Brunswick Cty. Gov't (Aug. 23, 2017), http://www.brunswickcountync.gov/brunswick-county-brunswick-county-schools-joint-response-august-22-2017-wect-online-story-h2go-looks-reverse-osmosis-systems-schools/ [Ex. 1].

The Court may take judicial notice of this document and other documents attached to or cited in this brief. In fact, most of these exhibits are government records, matters of public record, and/or are available on agency websites. *See, e.g.*, *Hall v. Virginia*, 385 F.3d 421, 424 & n.3 (4th Cir. 2004) (taking judicial notice of publicly available information on state government's website); *In re Katrina Canal Breaches Consol. Litig.*, 533 F. Supp. 2d 615, 631–33 & nn.14–15 (E.D. La. 2008) (collecting cases indicating that federal courts may take judicial notice of governmental websites on a Rule 12(b)(6) motion to dismiss). In addition, these exhibits are independently relevant to, and can be considered in support of, Defendants' alternative request for a stay. *See, e.g.*, *MBR Constr. Servs., Inc. v. Liberty Mut. Ins. Co.*, No. GJH-15-14, 2016 WL 3190650, at *3 (D. Md. June 6, 2016) ("[A]lthough a court is prohibited from considering most documents outside of the pleadings on a motion to dismiss, no similar restriction exists with respect to a court's consideration on a motion to stay.").

Services (DHHS).[2]  Indeed, just this week, one Plaintiff reported the lowest levels of C3 Dimer Acid since testing began.[3]

Plaintiffs nevertheless bring common-law tort claims and "seek to recover the costs—past, present, and future—necessary to manage and remove trace perfluorinated chemicals from their public drinking water supply."  Compl. ¶ 8.  But while Plaintiffs claim that their drinking water is contaminated, they do not and could not allege that the concentration violates or exceeds any drinking-water regulation.  Without such a requirement, Plaintiffs cannot demonstrate that any costs are "necessary to manage and remove" these chemicals, let alone that Defendants should be forced to bear those costs.  *Id.*  As North Carolina courts have found, the mere presence of a chemical in water does not allow a party to seek recovery for nuisance or negligence unless the amount of that chemical exceeds an amount set by regulation for the protection of human health.  This result makes practical sense:  if the mere presence of a contaminant at any level created tort liability, companies would face a nearly endless parade of lawsuits based on the mere presence of alleged chemicals in the water supply.

Likewise, even if Plaintiffs could show that DHHS's provisional drinking-water goal for C3 Dimer Acid of 140 parts per trillion was currently being exceeded, that showing would not make Plaintiffs' claims legally cognizable.  A provisional "goal" is just that:  a goal.  It is not the same as a regulation, which requires that an agency with statutory authority make an

---

[2]    *New GenX Results from the Sweeney Water Treatment Plant*, Cape Fear Pub. Util. Auth. (Jan. 18, 2018), http://www.cfpua.org/CivicAlerts.aspx?AID=811 [Ex. 2].

State officials have said the same thing:  "I feel very comfortable saying continue to drink the water . . . ."  Notes from Meeting of Roy Cooper, N.C. Governor, with N.C. State & Local Officials (July 24, 2017), https://news.nhcgov.com/wp-content/uploads/2017/06/Coopers-meeting-with-local-officials-Monday-July-24.pdf (emphasis added) [Ex. 3].

[3]    *Brunswick County GenX Test Results*, Brunswick Cty. Gov't (Feb. 22, 2018), http://www.brunswickcountync.gov/brunswick-county-genx-test-results-14/ [Ex. 4].

2

investigation, including any necessary scientific studies, and engage in rulemaking. Allowing parties to recoup costs incurred to meet public-health goals would unseat this process and allow parties to generate their own "damages" by taking voluntary measures purportedly designed to benefit the general public.

At a minimum, if the Court concludes that Plaintiffs have pleaded legally cognizable claims, the doctrine of primary jurisdiction calls for those claims to be stayed. When concern over C3 Dimer Acid arose last summer, the North Carolina Department of Environmental Quality (DEQ), the federal Environmental Protection Agency (EPA), and other agencies with responsibility for public health initiated important regulatory processes and investigations that are still underway. Among other things, the State, working with the EPA, is critically reviewing the available scientific data to determine whether C3 Dimer Acid actually poses a potential health risk. If the State so finds, it may then establish a maximum contaminant level for C3 Dimer Acid and other PFCs in drinking water.

These determinations, which turn on complex questions related to potential industrial and commercial sources of PFCs as well as hydrogeology, toxicology, and epidemiology, will bear directly on the claims in this action. It therefore makes eminent sense to defer to these agencies and their considerable expertise in the first instance. As the Fourth Circuit has explained, "[t]he advisability of invoking primary jurisdiction is greatest when the issue is already before the agency." *CF Indus., Inc. v. Transcon. Gas Pipe Line Corp.*, 614 F.2d 33, 35 (4th Cir. 1980) (quoting *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 532 F.2d 412, 420 (5th Cir. 1976)).

## **BACKGROUND**

Below, Defendants provide an overview of Plaintiffs' claims. In addition, to provide context for those claims and for Defendants' alternative request for a stay, Defendants describe

3

(1) the statutory regime governing safe-drinking-water standards, and (2) the extensive investigative and response efforts being undertaken by DEQ, the EPA, and other agencies with respect to Fayetteville Works.

## I.     PLAINTIFFS' CLAIMS

Plaintiffs' claims are based on Defendants' operations at a manufacturing facility in North Carolina known as Fayetteville Works.  Compl. ¶¶ 1–2.  As would be expected for a chemical-manufacturing operation, Fayetteville Works has been subject to regular federal and state regulation, including DEQ-issued permits that govern the discharge of wastewater to the Cape Fear River.  *See, e.g.*, *id.* ¶¶ 42–56.  Since late last spring, Fayetteville Works, which has operated for forty years, has received considerable press and public scrutiny based on the issues raised in Plaintiffs' complaint.  The site is currently the subject of intensive and ongoing investigative and response actions being conducted by and in cooperation with the State.  *See infra* pp. 7–16.

Plaintiffs allege that Defendants discharged a chemical known as C3 Dimer Acid, as well as other perfluoroalkyl substances, into the Cape Fear River and surrounding areas.  Compl. ¶ 100.  Plaintiffs bring claims for public nuisance, private nuisance, trespass to real property, trespass to chattels, negligence per se, negligence, failure to warn, negligent manufacture, injury to riparian rights, and punitive damages, and seek compensatory damages, punitive damages, and injunctive relief.  *See id.* ¶¶ 99–150.  In particular, Plaintiffs "seek to recover the costs—past, present, and future—necessary to manage and remove Defendants' perfluorinated chemicals from their public drinking water supply."  *Id.* ¶ 8.

4

## II.    FEDERAL AND STATE AUTHORITY OVER SAFE-DRINKING-WATER STANDARDS

Plaintiffs' claims are inextricably tied to questions concerning safe drinking water and whether and at what levels certain chemicals render Plaintiffs' water unsafe and in need of treatment. *See supra* p. 4. As Plaintiff Cape Fear Public Utility Authority (CFPUA) states on its website, "[w]ater distributed by the CFPUA is constantly measured against safety standards established by the [EPA] and [DEQ]."[4] Plaintiffs' complaint, however, barely refers to the statutory regime that governs the establishment and enforcement of standards for safe drinking water, which Defendants describe briefly below.

The federal Safe Drinking Water Act ensures that water systems meet minimum national standards for the protection of public health. *See* 42 U.S.C. § 300f (2012). The Act is enforced by states as well as the EPA. States may apply to the EPA for primary enforcement responsibility, and the EPA may grant such responsibility if it determines that the state has adopted regulations "no less stringent" than the federal regulations and has appropriate enforcement mechanisms in place. *Id.* § 300g-2(a)(1), (2).

North Carolina has done just that. Under the North Carolina Safe Drinking Water Act, the State "regulate[s] water systems within the State which supply drinking water that may affect the public health." N.C. Gen. Stat. § 130A-312 (2017). Under the State's regulatory scheme, "[t]he [Environmental Management] Commission shall adopt and the Secretary [of DEQ] shall enforce drinking water rules to regulate public water systems." *Id.* § 130A-315(a). These rules "[s]pecify contaminants which may have an adverse effect on the public health." *Id.*

---

[4]    *Water Treatment*, Cape Fear Pub. Util. Auth., http://www.cfpua.org/257/Water-Treatment (last visited Mar. 1, 2018) [Ex. 5]; *see also* Brunswick Cty., County of Brunswick Water Quality Report – 2016, at 2, http://www.brunswickcountync.gov/wp-content/uploads/2015/02/CCR-2016.pdf [Ex. 6] ("In order to ensure that tap water is safe to drink, EPA prescribes regulations which limit the amount of certain contaminants in water provided by public water systems.").

§ 130A-315(b)(1). In addition, for each contaminant, the rules specify either "[a] maximum contaminant level which is acceptable in water for human consumption, if it is feasible to establish the level of the contaminant in water in public water systems," or "[o]ne or more treatment techniques which lead to a reduction in the level of contaminants sufficient to protect the public health." *Id*. § 130A-315(b)(2)(a), (b). Further, the rules "[e]stablish criteria and procedures to assure a supply of drinking water which dependably complies with maximum contaminant levels and treatment techniques." *Id.* § 130A-315(b)(3).

Plaintiffs do not allege that there is a maximum contaminant level for C3 Dimer Acid or the other chemicals identified in their complaint. This is because no such level has been set.[5]

In the absence of a maximum contaminant level, Plaintiffs cite a provisional drinking-water health goal of 140 parts per trillion that DHHS announced in July 2017. Compl. ¶ 88. Prior to that announcement, the health goal for C3 Dimer Acid in drinking water was 71,000 parts per trillion.[6] Plaintiffs allege that the "updated health goal of 140-parts-per-trillion is expected to be the most conservative and health protective for non-cancer effects in bottle-fed infants, pregnant women, lactating women, children and adults." Compl. ¶ 88. DHHS was careful to describe the provisional 140-parts-per-trillion health goal as "not a boundary line between a 'safe' and 'dangerous' level of a chemical" but instead "the concentration of [C3

---

[5]    *GenX Frequently Asked Questions*, N.C. Dep't of Envtl. Quality 3 (last updated Oct. 4, 2017), https://files.nc.gov/ncdeq/GenX/FAQ_updated_100417-5.pdf [Ex. 7] [hereinafter DEQ FAQ].

[6]    *See* N.C. Dep't of Health & Human Servs., *Questions and Answers Regarding North Carolina Department of Health and Human Services Updated Risk Assessment for GenX (Perfluoro-2-propoxypropanoic acid)* (July 14, 2017), https://ncdenr.s3.amazonaws.com/s3fs-public/GenX/NC%20DHHS%20Risk%20Assessment%20FAQ%20Final%20Clean%20071417%20PM.pdf [Ex. 8].

Dimer Acid] at which no adverse non-cancer health effects would be anticipated in the most sensitive population over an entire lifetime of exposure." DEQ FAQ at 6.

DHHS also has explained that health goals are "non-regulatory [and] non-enforceable" and are subject to "change as new information becomes available."[7] Thus, DHHS acknowledged that the 140-parts-per-trillion health goal is subject to change and has explicitly sought a recommendation from scientists on the North Carolina Science Advisory Board about that issue.[8] Moreover, the 140-parts-per-trillion health goal is a goal for finished drinking water and not for water at the point of discharge into the Cape Fear River.

## III.  REGULATORY ACTIVITY CONCERNING C3 DIMER ACID AND OTHER CHEMICALS

Plaintiffs' claims arise against the backdrop of extensive regulatory activity that has taken place since concerns about C3 Dimer Acid were brought to public attention late last spring.[9] As a result of this activity:

- Wastewater streams that contained C3 Dimer Acid and had been discharged to the Cape Fear River were diverted and are now being shipped offsite;

---

[7]  *See* Zack Moore, N.C. Dep't of Health & Human Servs., *GenX Health Studies and Health Advisories* 5 (Dec. 4, 2017), https://files.nc.gov/ncdeq/GenX/SAB/GenX%20Health%20Studies%20and%20Advisories%20SAB%2012_4_2017.pdf [Ex. 9].

[8]  *See* Zack Moore, N.C. Dep't of Health & Human Servs., *GenX Health Studies and Health Advisories* 14 (Jan. 29, 2018), https://files.nc.gov/ncdeq/GenX/SAB/DHHS%20Presentation-SAB%20012918.pdf [Ex. 10] (stating as a "Suggested Charge[] for SAB" that the SAB "[r]eview the GenX provisional health goal as calculated by DHHS to determine if the SAB recommends any modifications").

[9]  *Baron & Budd Investigating Potential Lawsuits Regarding PFOS and PFOA Contamination of Drinking Water*, Bus. Wire, May 17, 2017, https://www.businesswire.com/news/home/20170517006321/en/Baron-Budd-Investigating-Potential-Lawsuits-PFOS-PFOA [Ex. 11]; Kevin Maurer, *Absent proof, Brockovich's law firm to end GenX probe*, StarNews Online (Sept. 26, 2017), http://www.starnewsonline.com/news/20170926/absent-proof-brockovichs-law-firm-to-end-genx-probe [Ex. 12].

- Drinking water is being regularly tested for C3 Dimer Acid and, as Plaintiffs are reporting to their customers, the concentration of C3 Dimer Acid is below the State's 140-parts-per-trillion provisional health goal; and

- Plaintiffs, in the face of these test results, are telling their customers that the water they supply is safe to drink.

At the same time, the State has initiated other activities to examine the questions of whether and to what extent C3 Dimer Acid actually poses a risk, whether C3 Dimer Acid should be regulated, and whether DHHS's provisional health goal of 140 parts per trillion should be revised. Some of these activities are described below.

A.    Review by the Science Advisory Board

The Secretaries of North Carolina's DEQ and DHHS have established a Science Advisory Board (SAB) with sixteen members who come from academic institutions, the public and private sectors, and independent research facilities.[10]  The SAB's duties include:

- recommending reviews of contaminants discharged into the environment;

- consulting DEQ regarding contaminant regulations;

- assisting DEQ and DHHS in identifying contaminants of emerging concern;

- determining whether further study is needed for identified contaminants of concern;

- assisting the Secretaries by providing expertise in environmental and human impacts from exposure to hazardous contaminants; and

---

[10]    *See* N.C. Dep't of Envtl. Quality & N.C. Dep't of Health & Human Servs., Secretaries' Science Advisory Board Charter 3 (July 28, 2017), https://files.nc.gov/governor/documents/files/Science%20Advisory%20Board%20Charter.pdf [Ex. 13].

8

- providing inputs to DHHS as it establishes health goals for emerging contaminants.[11]

In August 2017, Governor Cooper expanded the SAB's role in examining unregulated contaminants of "emerging concern" for their potential impacts on human health and the environment.[12] As part of its expanded mission, the SAB is charged with reviewing the provisional health goal announced by DHHS of 140 parts per trillion and determining if that goal should be modified.[13] Demonstrating the complexity of that task, DEQ and DHHS have posed numerous questions to the SAB, along with requests for criteria to consider.[14] The SAB's recommendations will be considered by DEQ in its development of groundwater- and surface-water-standard proposals to be presented to the Environmental Management Commission for rulemaking. *Id.*

## B. DEQ and DHHS's Involvement in Investigating and Addressing C3 Dimer Acid

DEQ and DHHS have taken other steps to address concerns about C3 Dimer Acid. These efforts are described below.

**Water sampling.** Since June 2017, DEQ has conducted extensive sampling along the Cape Fear River and at Fayetteville Works, including sampling for C3 Dimer Acid and other

---

[11] Secretaries' Sci. Advisory Bd., Meeting Summary 2 (Oct. 23, 2017), https://files.nc.gov/ncdeq/GenX/SAB/2017%2010%2023%20SAB%20Minutes%20Adopted.pdf [Ex. 14].

[12] *See supra* note 10 & Ex. 13.

[13] *See supra* note 8 & Ex. 10.

[14] *See* N.C. Dep't of Envtl. Quality, Issues Relevant to Deriving Surface Water Quality Standards, https://files.nc.gov/ncdeq/GenX/SAB/Issues%20Relative%20to%20Deriving%20Surface%20WQ%20Standards.pdf [Ex. 15].

9

fluorinated compounds.[15] DEQ has explained that this sampling is part of an approach in which DEQ is "evaluating long-term solutions for the Chemours facility" with the understanding that additional information is necessary "before a comprehensive solution can be determined and implemented." DEQ FAQ at 7. DEQ has maintained an open dialogue with residents regarding residential well sampling, including holding information sessions with the community, posting sampling results on their website, and working with residents to coordinate deliveries of bottled water as necessary.[16] The EPA has closely monitored and supported DEQ's efforts.[17]

**Review of internal records and information.** DEQ has requested and received voluminous records and information from Defendant Chemours in connection with its investigation. DEQ, for example, has collected records concerning the wastewater streams at Fayetteville Works, "the discharge of [C3 Dimer Acid] and other emerging contaminants," and information that Chemours previously provided to the EPA.[18] In addition, in late August 2017, Chemours provided DEQ with health studies on C3 Dimer Acid compounds that were conducted by Defendant DuPont or Chemours and previously provided to the EPA.[19] Chemours

---

[15]   *GenX Timeline*, N.C. Dep't of Envtl. Quality, https://deq.nc.gov/news/hot-topics/genx-investigation/genx-timeline (last visited Mar. 2, 2018) [Ex. 16] [hereinafter DEQ GenX Timeline].

[16]   *See Groundwater*, N.C. Dep't of Envtl. Quality, https://deq.nc.gov/news/hot-topics/genx-investigation/groundwater (last visited Mar. 1, 2018) [Ex. 17].

[17]   Steve DeVane, *EPA says state can regulate GenX, similar compounds*, Fayetteville Observer (Feb. 9, 2018), http://www.fayobserver.com/news/20180209/epa-says-state-can-regulate-genx-similar-compounds [Ex. 18].

[18]   *See* Partial Consent Order, *North Carolina v. Chemours Co. FC*, No. 17 CVS 580 (N.C. Super. Ct. Sept. 8, 2017) [Ex. 19] (citing July 21, 2017 letter and others).

[19]   *See* Letter from R. Steven DeGeorge, Robinson, Bradshaw & Hinson, P.A., to William F. Lane, Gen. Counsel, N.C. Dep't of Envtl. Quality (Aug. 25, 2017) [Ex. 20].

supplemented this production on November 29, 2017, and on February 6, 2018.[20]  Chemours has

a continuing obligation to respond to information requests by DEQ.  *See* Ex. 9 (Sept. 8, 2017

Consent Order).

**Review of health information.**  DHHS also continues to review available health- and

toxicity-studies data and to work with the EPA to ensure protection of human health and

formulate guidance about any potential health risks associated with C3 Dimer Acid.  *See* DEQ

GenX Timeline.  DEQ's efforts to ensure protection of human health and to formulate guidance

about any potential health risks have been well-documented.  For example, DEQ holds weekly

conference calls to update local officials on the State's investigation and publishes new

information on a public web page devoted to these issues.  *See id.*

Based on its work to date, DHHS has assured the public that drinking water derived from

the Cape Fear River is safe to drink while the investigation continues.  For example, a DHHS

official has stated that they "feel very comfortable saying [to] continue to drink the water

knowing what we know about the levels of [C3 Dimer Acid]."[21]  DHHS also has released data

that addresses Plaintiffs' allegations concerning increased cancer rates due to C3 Dimer Acid,

finding that "the results do not point to any consistent trends in counties that get their water from

---

[20]    *See* Letter from Eric A. Rey, Arnold & Porter Kaye Scholer LLP, to William F. Lane, Gen. Counsel, N.C. Dep't of Envtl. Quality, and Francisco J. Benzoni, Assistant Att'y Gen., N.C. Dep't of Justice (Nov. 29, 2017) [Ex. 21]; Letter from Eric A. Rey, Arnold & Porter Kaye Scholer LLP, to William F. Lane, Gen. Counsel, N.C. Dep't of Envtl. Quality, and Francisco J. Benzoni, Assistant Att'y Gen., N.C. Dep't of Justice (Feb. 6, 2018) [Ex. 22].

[21]    *See supra* note 2 & Ex. 3.

the lower Cape Fear" and that, with limited exceptions, "county rates for these cancers were similar to state rates."[22]

In addition, Plaintiffs themselves have assured the public that the water is safe to drink. One Plaintiff has explained that it "continue[s] to have full confidence that the Brunswick County water supply—including at our schools—is absolutely safe to drink,"[23] and last week reported the lowest levels of C3 Dimer Acid since testing began.[24] The other Plaintiff has stated that testing for C3 Dimer Acid shows levels well below the conservative provisional health goal of 140 parts per trillion.[25]

**DEQ's state court action.** In September 2017, DEQ initiated a lawsuit in Bladen County Superior Court against Chemours "to address environmental contamination caused by Chemours' discharge of certain chemical manufacturing byproducts into the waters of the State from Chemours' Fayetteville Works."[26] DEQ subsequently determined, based on Chemours' compliance with requirements set forth by DEQ, that DEQ would not suspend Chemours' NPDES permit. DEQ, however, confirmed that it will "continue to monitor the performance of

---

[22]  Press Release, N.C. Dep't of Health & Human Servs., N.C. DHHS Releases Summary of Selected Cancer Rates for Counties in Cape Fear Region (June 29, 2017), https://www.ncdhhs.gov/news/press-releases/nc-dhhs-releases-summary-selected-cancer-rates-counties-cape-fear-region [Ex. 23].

[23]  *See supra* note 1 & Ex. 1.

[24]  *See supra* note 3 & Ex. 4.

[25]  *See supra* note 2 & Ex. 2.

[26]  Letter from Francisco J. Benzoni, Assistant Att'y Gen., N.C. Dep't of Justice, to Chemours Co. FC (Sept. 5, 2017), https://files.nc.gov/ncdeq/GenX/Letter%20from%20NCDOJ%20to%20Chemours.pdf [Ex. 24].

12

all required remedial measures by Chemours."[27]  DEQ's state court action remains pending.  *See Stipulation of All Parties Regarding Settlement Procedures and Withdrawal of Motion to Intervene*, *North Carolina v. Chemours Co. FC*, No. 17 CVS 580 (N.C. Super. Ct. Nov. 13, 2017) (Ex. 28).  Under a stipulation entered in that case, Plaintiffs, like all members of the public, will have the right to comment on any proposed settlement between Chemours and the State.  *Id.*

**Oversight of response measures and mitigation.**  DEQ, as well as the EPA, also is supervising and monitoring numerous measures by Chemours to mitigate C3 Dimer Acid exposure to local residents:

- On June 27, 2017, DEQ conducted an on-site inspection to verify that Chemours was redirecting process wastewater with C3 Dimer Acid into temporary storage tanks for off-site shipment and incineration.  DEQ FAQ at 1.

- On or about August 31, 2017, the EPA concluded that abatement measures undertaken by Chemours had substantially reduced the levels of certain PFECAs, including C3 Dimer Acid.  *Id.*

- On November 16, 2017, DEQ ordered Chemours to cease discharging wastewater from the Flouronomers/Nafion manufacturing area effective November 30, 2017.[28]

---

[27]  Letter from Linda Culpepper, Deputy Dir., Div. of Water Res., N.C. Dep't of Envtl. Quality, to Ellis H. McGaughy, Plant Manager, Chemours Co. (Oct. 24, 2017), https://files.nc.gov/ncdeq/documents/files/2017%2010%2024%20Ltr%20to%20Ellis%20McGaughy%20Chemours%20re%20NPDES%20permit.pdf?7.webAb0nLemriVy0Nx3qqTJYnXQ4Nmc [Ex. 25].

[28]  Letter from Linda Culpepper, Deputy Dir., Div. of Water Res., N.C. Dep't of Envtl. Quality, to Ellis H. McGaughy, Plant Manager, Chemours Co. (Nov. 16, 2017) [Ex. 26].

- On or about November 29, 2017, Chemours severed the pipe conveying process wastewater from the Flouronomers/Nafion process area to the Wastewater Treatment Plant and notified DEQ that it would begin collecting all process wastewater from that area for offsite disposal.[29]

DEQ recently explained that "[s]ince the state was successful at getting Chemours to stop the release of [C3 Dimer Acid] into the Cape Fear River, we have seen a precipitous decline in the concentrations of the chemical compound at all sites." DEQ FAQ at 1. In particular, according to DEQ, "[t]ests continue to show that levels of [C3 Dimer Acid] in finished drinking water are below the state's health goal. State water-quality officials plan to continue water sampling and analysis at the finished water sites for the foreseeable future." *Id.* Plaintiffs, too, acknowledge this fact, stating that: "[l]evels of [C3 Dimer Acid] continue to remain below the DHHS health goal of 140 [parts per trillion]."[30]

Meanwhile, "DEQ and DHHS are working with the EPA and [the Centers for Disease Control] to obtain more research that can be used to develop regulatory guidance for [C3 Dimer Acid] and other emerging compounds," and "DEQ is continuing to monitor the facility to ensure releases have stopped." *Id.* at 2. Chemours continues to provide DEQ and the EPA with sampling results collected in and around the facility—including data collected from surface water, groundwater, rainwater, and the site's outfall.

## ARGUMENT

As discussed below, Plaintiffs' complaint fails to state any legally plausible claim for relief. Alternatively, the State's extensive regulatory efforts warrant a stay under the primary-jurisdiction doctrine.

---

[29]   *See supra* note 27 & Ex. 25.

[30]   *See supra* note 2 & Ex. 2.

# I.   PLAINTIFFS HAVE FAILED TO STATE ANY LEGALLY COGNIZABLE CLAIM

A Rule 12(b)(6) motion tests the complaint's legal and factual sufficiency.  *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009).  The Court need not accept as true a complaint's "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement," *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009), or its unwarranted inferences, unreasonable conclusions, or arguments.  *Vitol, S.A. v. Primerose Shipping Co.*, 708 F.3d 527, 548 (4th Cir. 2013).

## A.   Plaintiffs Fail to Plead the Elements of Nuisance (Counts I and II).

Plaintiffs bring claims for both public and private nuisance.  Compl. ¶¶ 99–114.  "To recover in nuisance, plaintiffs must show an unreasonable interference with the use and enjoyment of their property."  *Jordan v. Foust Oil Co.*, 116 N.C. App. 155, 167, 447 S.E.2d 491, 498 (1994).  To bring a public-nuisance action, Plaintiffs must make a "showing of unusual and special damage, differing from that suffered by the general public."  *Barrier v. Troutman*, 231 N.C. 47, 49, 55 S.E.2d 923, 925 (1949).  Plaintiffs do not allege an "unreasonable interference" or any "unusual or special damage," and therefore they fail to state a claim for nuisance.

Plaintiffs' claims are based on the mere presence of C3 Dimer Acid and other chemicals in the water, not their concentration.  But there is no federal or state statute or regulation that requires that water be completely free of C3 Dimer Acid or any of the other chemicals identified in Plaintiffs' complaint.  Nor is there any regulation that sets a maximum contaminant level for any of these contaminants.

Plaintiffs therefore cannot establish nuisance based on the presence of such chemicals.  In *Brooks v. E.I. du Pont de Nemours & Co.*, for example, the court rejected the argument "that it is not necessary for contamination to reach a level exceeding groundwater standards before such

contamination is actionable." 944 F. Supp. 448, 449 (E.D.N.C. 1996). As the court explained, nuisance claims fail as a matter of law where "the levels of contaminants . . . fall below the maximum allowable concentration for all contaminants at issue." *Id.*; *see also, e.g.*, *In re WildeWood Litig.*, 52 F.3d 499, 503 (4th Cir. 1995) (holding that nuisance claims failed where chemical levels did not "rise to [a] level of toxicological concern" and thus did not represent an unreasonable interference with the plaintiffs' property).

Plaintiffs' reliance on the provisional drinking-water goal of 140 parts per trillion does not change this result. As an initial matter, one of the Plaintiffs (CFPUA) alleges that C3 Dimer Acid has been found in its water but does not allege that the levels exceeded the provisional health goal of 140 parts per trillion. Moreover, the 140-parts-per-trillion goal is just that—a goal. It is not mandatory and does not set forth a requirement that Plaintiffs must meet. *See supra* pp. 5–7. Plaintiffs should not be permitted to recover the "costs of removing these chemicals from drinking water" on the theory that such treatment is being done in an effort to meet a provisional health goal. Compl. ¶ 1. Such an approach would open the floodgates to tort suits based on nothing more than trace levels of chemicals in water.

### B. Plaintiffs Fail to Plead the Elements of Trespass to Real Property (Count III).

In Count III, Plaintiffs bring a claim for trespass to real property. Compl. ¶¶ 115–18. This claim fails. "The elements of trespass to real property" include "*damage* to the plaintiff from the trespass." *Keyzer v. Amerlink, Ltd.*, 173 N.C. App. 284, 289, 618 S.E.2d 768, 772 (2005) (emphasis added) (quoting *Broughton v. McClatchy Newspapers, Inc.*, 161 N.C. App. 20, 32, 588 S.E.2d 20, 29 (2003)), *aff'd per curium*, 360 N.C. 397, 627 S.E.2d 462 (2006); *see also, e.g.*, *Singleton v. Haywood Elec. Membership Corp.*, 357 N.C. 623, 627, 588 S.E.2d 871, 874 (2003) (same). Accordingly, where a plaintiff seeks compensatory damages for trespass, as

Plaintiffs do here, they "must allege facts showing actual damage" to realty. *Matthews v. Forrest*, 235 N.C. 281, 283, 69 S.E.2d 553, 555 (1952). Plaintiffs fail to plead this requirement.

Plaintiffs' theory of "damage" is not based on their personal use or consumption of the water. Rather, it is based on the "costs—past, present, and future—necessary to manage and remove Defendants' perfluorinated chemicals from their public drinking water supply." Compl. ¶ 8. Plaintiffs cannot show any damage, because those costs are not "necessary" in the absence of a state or federal requirement setting forth a maximum level of C3 Dimer Acid or other chemicals in drinking water. *See supra* pp. 5–7. Indeed, as Plaintiffs are telling their customers, not only is the water that they supply safe to drink, but testing confirms that, even without treatment, the level of C3 Dimer Acid is below the State's 140-parts-per-trillion health goal and declining. *See supra* pp. 1–2. Accordingly, Plaintiffs' claim for trespass to real property merits dismissal.

### C.    Plaintiffs Fail to Plead the Elements of Trespass to Chattels (Count IV).

Plaintiffs' trespass-to-chattels claim also fails. Compl. ¶¶ 119–22. "A successful action for trespass to chattel requires the party bringing the action to demonstrate that she had either actual or constructive possession of the personalty or goods in question at the time of the trespass" and "that there was an unauthorized, unlawful interference or dispossession of the property." *Fordham v. Eason*, 351 N.C. 151, 155, 521 S.E.2d 701, 704 (1999). Plaintiffs cannot demonstrate any "unlawful interference or dispossession of the property." *Id.*

Plaintiffs allege generally that "Defendants' operation of the Fayetteville Works facility . . . ha[s] resulted in an unauthorized interference with Plaintiffs' possession and use of their water and water systems" and has "resulted in substantial injury, damage, and harm to Plaintiffs." Compl. ¶¶ 120–21. These conclusory allegations do not meet Plaintiffs' burden under Rule 12(b)(6). *See supra* p. 15. Nor do Plaintiffs otherwise allege the elements of trespass

17

to chattels. The Restatement (Second) of Torts states that trespass to chattels "may be committed by intentionally (a) dispossessing another of the chattel, or (b) using or intermeddling with a chattel in the possession of another." Restatement (Second) of Torts § 217 (Am. Law Inst. 2017). Plaintiffs do not make such allegations. The alleged contamination never exceeded any regulatory requirements, never forced Plaintiffs to incur costs, and never required Plaintiffs to cease using their property or providing water to the public. In fact, Plaintiffs have continued to provide water while assuring the public that they "have full confidence" that the water "is absolutely safe to drink."[31] Plaintiffs cannot assert a cognizable claim for trespass to chattels based on water that they continue to sell to the public and market as "absolutely safe." *Id.*

### D. Plaintiffs Fail to Plead the Elements of Negligence (Counts V, VI, and VIII).

Plaintiffs' claims for negligence per se, negligence, and negligent manufacture require proof of injury or harm: "[t]he essential elements of any negligence claim" include "*certain actual injury or loss* sustained by the plaintiff." *Harris v. Daimler Chrysler Corp.*, 180 N.C. App. 551, 555, 638 S.E.2d 260, 265 (2006) (quoting *Peace River Elec. Coop., Inc. v. Ward Transformer Co.*, 116 N.C. App. 493, 511, 449 S.E.2d 202, 214 (1994)); *see also, e.g.*, W. Page Keeton et al., Prosser and Keeton on the Law of Torts: *Elements of Cause of Action* § 30, at 164–65 (5th ed. 1984) (recognizing that actual loss or damage is an element of a cause of action based on negligence). Plaintiffs fail to plead this requirement.

Plaintiffs' theory of harm, or breach of a duty, is based on the presence of C3 Dimer Acid and other chemicals in their water. But "contamination alone does not constitute an 'injury' sufficient to substantiate a negligence claim" where plaintiffs do not "allege any derivative harm from [the] contamination." *Rowe v. E.I. du Pont de Nemours & Co.*, 262 F.R.D. 451, 465 (D.N.J. 2009); *see also Rhodes v. E.I. du Pont de Nemours & Co.*, 636 F.3d 88, 95 (4th Cir.

---

[31] *See supra* note 1 & Ex. 1.

2011) ("The presence of [a chemical] in the public water supply or in the plaintiffs' blood does not, standing alone, establish harm or injury . . . ."). Likewise, Plaintiffs cannot demonstrate injury in the absence of any regulatory standard that was exceeded. *See, e.g.*, *Brooks*, 944 F. Supp. at 449 ("[S]ince the levels of contaminants estimated by plaintiffs' experts fall below the maximum allowable concentration for all contaminants at issue, the plaintiffs have failed to demonstrate even a prima facie showing that they have been damaged under North Carolina regulations."); *New Mexico v. Gen. Elec. Co.*, 335 F. Supp. 2d 1185, 1212 (D.N.M. 2004) (explaining that, under New Mexico law, "water need not be pristine to be drinkable, and use for drinking water purposes depends upon whether applicable water quality standards are met, not whether the water yet remains in its primordial state, untouched by any of the chemical remnants of the modern age"), *aff'd*, 204 F.3d 1122 (11th Cir. 1999).

Plaintiffs, who continue to sell water and are under no obligation to remove any chemicals from that water, have therefore suffered no harm. Nor can Plaintiffs establish injury by alleging that they might hypothetically incur costs at some uncertain date in the future. Possible future costs cannot meet Plaintiffs' burden of pleading injury. For example, in *Coker v. DaimlerChrysler Corp.*, the North Carolina Court of Appeals found that alleged future injuries were insufficient to show a cognizable legal injury. 172 N.C. App. 386, 397, 617 S.E.2d 306, 313 (2005). The court characterized the plaintiffs' "damages" for "possible future expenses not yet incurred" as "a hypothetical and an unsubstantiated diminution of value" for "damages" that had not been realized. *Id.* The court concluded that those damages did not constitute a "'concrete and particularized' injury" that was "actual and imminent." *Id.* The plaintiffs' claims were "too speculative and illusory to show a legal injury in fact." *Id.* Plaintiffs' alleged injuries

based on the costs of hypothetical future actions suffer from these problems and do not establish a claim for negligence.

### E. Plaintiffs Fail to Plead an Actionable Failure-to-Warn Theory (Count VII).

In Count VII, Plaintiffs allege a cause of action for "failure to warn." Compl. ¶¶ 135–38. North Carolina, however, recognizes a duty to warn only in limited situations that do not apply here. For example, "[f]ailure to warn, or breach of a duty to warn, is a type of negligence action under North Carolina products liability law." *Yates v. Ford Motor Co.*, No. 5:12-CV-752-FL, 2015 WL 2189774, at *2 (E.D.N.C. May 11, 2015); *see* N.C. Gen. Stat. § 99B-5 (2017). Similarly, North Carolina recognizes a duty to warn in the context of premises liability. *Thomas v. Weddle*, 167 N.C. App. 283, 290, 605 S.E.2d 244, 248–49 (2004).

This case does not involve the law of products liability or premises liability. Plaintiffs do not identify purchasers or distributors to whom any product manufacturer owed a duty to warn or claim that they were injured when visiting Defendants' property. Nor do Plaintiffs allege any other circumstances giving rise to a duty to warn that they can show was breached. Plaintiffs' failure-to-warn claim therefore lacks any cognizable legal basis.

### F. Plaintiffs Cannot Bring an Independent Cause of Action for Injury to Riparian Rights (Count IX).

In Count IX, Plaintiffs seek injunctive relief and damages based on injury to riparian rights. An injury to riparian rights, however, is not a standalone claim; allegations of that type of injury are typically included within a common-law tort, such as negligence or nuisance. *See*, *e.g.*, *Coastal Plains Utils., Inc. v. New Hanover Cty.*, 166 N.C. App. 333, 351, 601 S.E.2d 915, 927 (2004) (analyzing riparian rights in the context of a nuisance claim—not a standalone claim); *see also BSK Enters., Inc. v. Beroth Oil Co.*, 783 S.E.2d 236, 250 (N.C. Ct. App.)

(similar), *disc. rev. denied*, 787 S.E.2d 39, 787 S.E.2d 385 (N.C. 2016), and should be so limited here.

### G. Plaintiffs Cannot Bring an Independent Cause of Action for Punitive Damages (Count X).

In Count X, Plaintiffs bring a stand-alone cause of action for punitive damages. Compl. ¶¶ 148–50. "[A] claim for punitive damages is not a stand-alone claim." *Funderburk v. JPMorgan Chase Bank, N.A.*, 241 N.C. App. 415, 425, 775 S.E.2d 1, 8 (2015). This cause of action therefore fails as a matter of law.

## II. ALTERNATIVELY, THE PRIMARY-JURISDICTION DOCTRINE WARRANTS A STAY OF THESE PROCEEDINGS

If the Court declines to dismiss Plaintiffs' claims, Plaintiffs' claims warrant a stay under the primary-jurisdiction doctrine, which recognizes the "need to coordinate in an orderly and sensible manner the work of agencies and courts." *North Carolina v. Dep't of Health, Educ., & Welfare*, 480 F. Supp. 929, 935 (E.D.N.C. 1979). Through their state-law claims, Plaintiffs implicitly ask the Court to decide the maximum contaminant level for C3 Dimer Acid and other chemicals, in the absence of a current federal or state standard for these chemicals. Plaintiffs' complaint omits any reference to the extensive and highly publicized regulatory efforts that are ongoing to consider such a standard. Instead, Plaintiffs seek to have this case outpace these regulatory processes. The threat of interference with the ongoing regulatory process—and the potential for conflicting decisions—is extraordinarily high in this scenario.

The primary-jurisdiction doctrine exists for this very reason—not to deprive a court of its ability to hear a case, but to "control[] whether a court or agency should make the initial decision." *Id.* Courts consider four factors when deciding whether to apply the doctrine:

> (1)    whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise;

(2)     whether the question at issue is particularly within the agency's discretion;

(3)     whether there exists a substantial danger of inconsistent rulings; and

(4)     whether a prior application to the agency has been made.

*Schiller v. Tower Semiconductor Ltd.*, 449 F.3d 286, 295 (2d Cir. 2006); *see also Global NAPS N.C., Inc. v. BellSouth Telecomms., Inc.*, 455 F. Supp. 2d 447, 448 (E.D.N.C. 2006).  Each of these factors supports deferral to the jurisdiction and expertise of DEQ and the ongoing regulatory efforts being made.

**A.     Plaintiffs' Claims Turn on Questions and Considerations Within DEQ's Expertise.**

Primary jurisdiction applies where "federal litigation raises a difficult, technical question that falls within the expertise of a particular agency."  *Piney Run Preserv. Ass'n v. Cty. Comm'rs of Carroll Cty.*, 268 F.3d 255, 267 n.7 (4th Cir. 2001) (citing *Am. Auto. Mfrs. Ass'n v. Mass. Dep't of Envtl. Prot.*, 163 F.3d 74, 81 (1st Cir. 1998)).  This case presents that precise scenario. Among other things, Plaintiffs' claims would ask the Court to:

- determine permissible levels of C3 Dimer Acid in water;

- monitor alleged discharges of C3 Dimer Acid to confirm and identify discharges;

- evaluate the size of any discharges, the hydrogeologic conditions, and the impact of discharges on the environment and on drinking water;

- evaluate different response alternatives and determine how to implement response measures;

- monitor response activities and continue to evaluate effectiveness; and

- determine when no further action is necessary.

These tasks turn on highly specialized considerations and require expertise in toxicology, human health and ecological risk assessment, epidemiology, hydrogeology, engineering, and

technology that fall within the functions and expertise of DEQ. *See supra* pp. 7–14. Indeed, these are the precise issues that DEQ is currently considering with respect to Fayetteville Works. *See id.* Because many of the precise issues raised by Plaintiffs' claims are currently the subject of intense scrutiny by state and federal regulators, the Court should be reluctant to intervene in these activities. *See, e.g.*, *Gen. Elec. Co.*, 335 F. Supp. 2d 1185 (finding that myriad decisions involved in carrying out remediation were suited to the expertise of the agencies, not the conventional experience of courts).

### B. Issues Concerning How to Investigate, Monitor, and Address Surface-Water Quality Fall Within DEQ's Unique Discretion.

The EPA approved North Carolina's NPDES program in 1975, and the State has authority under the federal Clean Water Act, 33 U.S.C. § 1311, to administer and enforce the State's NPDES program.[32] North Carolina is thus authorized to address violations of the Clean Water Act, including prohibitions against unpermitted discharges of pollutants into surface waters. N.C. Gen. Stat. § 143-215.1. North Carolina's statutes implementing the NPDES program make clear that "[i]t is the intent of the General Assembly, through the duties and powers defined herein, to confer such authority upon the Department of Environmental Quality as shall be necessary to administer a complete program of water and air conservation, pollution abatement and control and to achieve a coordinated effort of pollution abatement and control with other jurisdictions." *Id*. § 143-211(c). DEQ is thus responsible for investigating, monitoring, and addressing any necessary water-quality response activities or actions.

---

[32] *See* National Pollutant Discharge Elimination System Memorandum of Agreement Between the State of North Carolina and the United States Environmental Protection Agency Region 4 (Oct. 15, 2007), https://www.epa.gov/sites/production/files/2013-09/documents/nc-moa-npdes.pdf [Ex. 27].

**C.** **The Relief Sought by Plaintiffs Creates a Substantial Risk of Inconsistent Conclusions and Requirements.**

A decision from the Court on Plaintiffs' claims at this time would create a substantial risk of inconsistent requirements that would jeopardize DEQ's ability to investigate and respond to the alleged C3 Dimer Acid contamination. By contrast, deferring to DEQ to set regulatory standards would ensure that decisions are made by "agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure." *Far E. Conference v. United States*, 342 U.S. 570, 574–75 (1952). Plaintiffs' requested relief would require the Court to make key determinations about the scope of any alleged contamination, a response strategy, and safe levels of C3 Dimer Acid. *See supra* p. 4. DEQ, in conjunction with the EPA and other authorities, is already working on these determinations. *See supra* pp. 7–14. Any determinations or requirements imposed by the Court in this case could create a conflict with conclusions reached by DEQ and would displace DEQ's ability to learn, adapt, and change as its investigation and regulatory oversight continues.

**D.** **The Issues Raised by Plaintiffs' Complaint Are Already Before DEQ.**

"The advisability of invoking primary jurisdiction is greatest when the issue is already before the agency." *CF Indus., Inc.*, 614 F.2d at 35 (quoting *Miss. Power & Light Co.*, 532 F.2d at 420). That is the case here. DEQ is actively investigating and responding to C3 Dimer Acid at Fayetteville Works.

DEQ, for example, has initiated a state-court action, in which it seeks similar relief to that which Plaintiffs seek in the present case. *See supra* pp. 12–13. DEQ, in consultation with DHHS, is also conducting a state investigation into the presence of C3 Dimer Acid and related compounds in the Cape Fear River. *See supra* pp. 7–14. Throughout this process, DEQ has kept the public informed—including holding weekly conference calls to update local officials and a

24

public website that provides information on these issues—and the public has had extensive opportunity to comment. *See* DEQ GenX Timeline. In addition, the EPA has closely monitored the progress of these agencies and supported the department's efforts as necessary. *See supra* p. 10. Under DEQ's oversight, C3 Dimer Acid levels in the Cape Fear River in the area of Fayetteville Works have declined and remain below the provisional drinking-water health goal of 140 parts per trillion. *See supra* p. 14.

The circumstances here call for deference to these regulatory efforts. Indeed, the Fourth Circuit has concluded that deference to the agency is proper under these circumstances, even when plaintiffs seek damages that may not be within the agency's authority to adjudicate. In *CF Industries*, for example, the Fourth Circuit reversed a decision not to defer to the regulatory agency that had begun reviewing key factual matters almost two years after litigation began. 614 F.2d at 36. The Fourth Circuit recognized that the regulatory agency would not be able to adjudicate potential damages, but determined that it was appropriate to defer to the agency and reserve damages until agency processes had completed. *Id*.; *Gen. Elec.*, 322 F. Supp. 2d at 1271 (deferring to the agency to avoid becoming involved in ongoing investigation and remediation process); *Dep't of Health, Educ., & Welfare*, 480 F. Supp. at 936 (deferring to the agency based on "technical complexity and breadth of the issues presently before the court"). Moreover, Plaintiffs can still be heard on issues before the agency, including any response action necessary to address water quality, both through agency processes and through a stipulation entered in the DEQ's state-court case, which provides for a notice-and-comment process on any settlement reached by the State and Chemours. *See supra* pp. 12–13 & Ex. 28 (stipulation).

Plaintiffs' attempts to use this lawsuit as a platform for sensationalizing issues relating to C3 Dimer Acid and thereby to undermine ongoing regulatory processes are at odds with public

assurances by Plaintiffs and regulators that the water is safe to drink. *See supra* pp. 11–12. In short, because key aspects of Plaintiffs' complaint are being extensively addressed through the proper regulatory channels, deference to those regulatory processes is warranted.

## MOTION TO STRIKE OR DISMISS NOTICES TO CONFORM

When they filed their master consolidated complaint, Plaintiffs also filed four separate documents styled as "notices to conform." These documents purport to allow parties to join in the master consolidated complaint without (1) being named as Plaintiffs in the master consolidated complaint, or (2) filing their own lawsuit. Neither the Town of Wrightsville Beach nor the Lower Cape Fear Water & Sewer Authority has filed a lawsuit, and their names do not appear in the master consolidated complaint. The master consolidated complaint, moreover, does not raise any plaintiff-specific allegations. It refers only to "Plaintiffs."

Plaintiffs' approach will lead to serious inefficiencies. Most notably, Plaintiffs have created a structure that invites the serial addition of more Plaintiffs. Anyone who wants to join the case would simply file a "notice to conform." The litigation would become a moving target (perhaps what Plaintiffs desire) at Defendants' expense.

To be clear, Defendants welcome the opportunity to confer with Plaintiffs on mechanisms to streamline this litigation. On this issue, however, Plaintiffs did not confer with Defendants. Nor did Plaintiffs propose this procedure at the January 4, 2018 status conference.

There is no efficiency that would be achieved by deviating from the Court's January 4, 2018 order. That order, consistent with discussions at the January 4 status conference, called for the filing of two complaints. Those complaints can name all plaintiffs who choose to join together under Rule 20(a)(1) of the Federal Rules. Defendants therefore request that the Court

strike or dismiss the "notices to conform" filed on January 31, 2018. *See* ECF Nos. 36, 37, 38, 39.

## I.     BACKGROUND

The Court's January 4 order authorized the filing of a master consolidated complaint that would "concern Cape Fear Public Utility Authority and Brunswick County plaintiffs." ECF No. 33 at 2. Brunswick County and CFPUA did file a master consolidated complaint, but that pleading contained no allegations as to any specific water supplier. *See* ECF No. 35 ¶ 9. Instead, Brunswick County and CFPUA filed separate documents styled as "Notice[s] to Conform to Master Complaint of Public Water Utilities." *See* ECF Nos. 36, 37.

Plaintiffs also simultaneously filed "notices" for two additional public-water providers— Wrightsville Beach and Lower Cape Fear. *See* ECF Nos. 38, 39. These formerly undisclosed utilities did not (1) file complaints, (2) have summonses issued, (3) serve Defendants with a complaint or summons, (4) move to intervene, or (5) otherwise request permission to join this case under any federal civil rule. Each "notice" nonetheless refers to the filing entity as a "Plaintiff" that purports to assert "claims against the named Defendants." ECF No. 38 at 1–2; ECF No. 39 at 1–2.

## II.     ARGUMENT

Rule 7 of the Federal Rules of Civil Procedure establishes the scope of pleading in federal court. See 5 Charles A. Wright, Federal Practice and Procedure § 1181. The rule expressly itemizes an exclusive list of permitted pleadings. Fed. R. Civ. P. 7(a). The list does not include "notices to conform." *See id.*

Although some courts presiding over multidistrict litigation have entered orders permitting the filing of "notices to conform," that structure is unwarranted here. *See, e.g.*, *In re*

*Syngenta AG MIR162 Corn Litig.*, MDL No. 2591 (D. Kan. June 3, 2015), ECF No. 461,

http://www.syngentacorncase.com/wp-content/uploads/2015/11/ORDER-approving-NEW-

Notices-to-Conform-to-Master-Complaints-wNotices-attached-Doc.-461.pdf.  In each of those

mass-filing cases, after formal designation to proceed as an MDL by the Judicial Panel on

Multidistrict Litigation (and presumably after the parties in the MDL had an opportunity to meet

and confer about case management), the court issued an order that permitted the filing of notices

to conform.

That case, by contrast, originally involved only two Plaintiff water suppliers, and now

putatively includes four.  This case is not an MDL—or even a mass filing.

Plaintiffs implicitly acknowledge that Rule 7 does not recognize their "notices to

conform":  Plaintiffs' filings include a request (not a motion) that the Court deem the notices to

be "complaints" under Rule 7(a)(1).  ECF No. 36 at 2; ECF No. 37 at 2; ECF No. 38 at 2; ECF

No. 39 at 2.  This request for retroactive approval, however, contains no reasoning to justify a

deviation from the standard rules.

That deviation will likely create needless inefficiencies.  Plaintiffs' approach, for

example, will:

- create a presumption that any party that desires to join as a Plaintiff is exempt
  from the requirement of serving process or a complaint;

- enable Plaintiffs to argue that "notices" relate back to the filing of the "Master
  Complaint" for purposes of the statute of limitations;

- countenance an argument that the "notices to conform" will excuse new Plaintiffs
  from procedural requirements related to the joinder of parties and claims; and

- invite a host of questions regarding discovery deadlines and application of the discovery record to new Plaintiffs, such as:
  - Would a new Plaintiff be subject to existing discovery deadlines?
  - Would a new Plaintiff be entitled to take discovery that had already been taken?
  - May new Plaintiffs file "notices to conform" after discovery is completed?

Defendants will vigorously oppose each of these potential issues.

The "notices to conform" filed by Lower Cape Fear and Wrightsville Beach have another defect:  No summons has been issued in connection with these "pleadings," and there is no indication that these jurisdictional documents are forthcoming.  Nor have Lower Cape Fear and Wrightsville Beach attempted to serve Defendants in compliance with Rule 4(h).

Service of a copy of a valid complaint and summons "is the means by which the court asserts its personal jurisdiction over the defendant."  *United States v. Perez*, 752 F.3d 398, 405 (4th Cir. 2014).  The "service of the summons triggers [a] defendant's duty to file a responsive pleading to the complaint."  *Id.*  Without the service of a valid summons and complaint, these new entities cannot obtain personal jurisdiction over Defendants—a failure that warrants dismissal under Rules 12(b)(2), 12(b)(4), and 12(b)(5).  *Id.*

## CONCLUSION

Plaintiffs' complaint fails under Rule 12(b)(6) because their complaint does not state any legally cognizable claim.  Alternatively, the primary-jurisdiction doctrine warrants that the case be stayed.

Additionally, Defendants respectfully ask that the Court strike or dismiss the "notices to conform" filed by Brunswick County, the Cape Fear Public Utility Authority, the Town of Wrightsville Beach, and the Lower Cape Fear Water & Sewer Authority.

29

This 2nd day of March, 2018.

                                        ELLIS & WINTERS LLP

                                        /s/ Jonathan D. Sasser
                                        Jonathan D. Sasser
                                        N.C. State Bar No. 10028
                                        Stephen D. Feldman
                                        N.C. State Bar No. 34940
                                        Post Office Box 33550
                                        Raleigh, North Carolina 27636
                                        Telephone: (919) 865-7000
                                        jon.sasser@elliswinters.com
                                        stephen.feldman@elliswinters.com

                                        Counsel for Defendants

<u>CERTIFICATE OF SERVICE</u>

I do certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing all counsel of record.

This 2nd day of March, 2018.

/s/ Jonathan D. Sasser
Jonathan D. Sasser